UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 03/26/2020

------------------------------------------------------------- X

UNITED STATES OF AMERICA                     :

      -against-                                        :

                                   :

EMMANUEL BONAFE,                                :

                                   :

                    Defendant.         :

------------------------------------------------------------- X

19-CR-862 (VEC)

ORDER

VALERIE CAPRONI, United States District Judge:

WHEREAS on January 30, 2020, the Court denied Defendant Emmanuel Bonafe's motion for reconsideration of his pretrial detention, Hearing Tr. (Dkt. 90) at 42;

WHEREAS the Court found that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community," 18 U.S.C. § 3142(e)(1), based on the Government's proffer that Mr. Bonafe has been a high ranking member of the Latin Kings, who has professed access to firearms and has participated in multiple assaults and robberies, *see* Hearing Tr. at 42;

WHEREAS Mr. Bonafe has submitted a second motion for reconsideration of his detention based on audio recordings received during discovery, which in Defendants' view, show that one of the assaults discussed at the hearing was not a "slashing" (the term used at the hearing) because a knife might not have been used during the attack, *see* Exs. 1, 3[1];

WHEREAS Mr. Bonafe also seeks reconsideration based on the COVID-19 outbreak, which has reportedly hindered his access to the law library and his ability to review materials produced during discovery, *see* Ex. 3;

---

[1] The parties' submissions were not filed on ECF and were instead emailed directly to the Court. Neither side's submission contains a request for sealing. To promote public access to judicial documents, those submissions are attached herein as Exhibits 1, 2, and 3.

WHEREAS Mr. Bonafe has waived his right to appear at a hearing and has requested that his motion be decided on the papers; and

WHEREAS Mr. Bonafe, due to the nature of the crimes charged in the indictment, faces a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community," 18 U.S.C. § 3142(e)(3);

IT IS HEREBY ORDERED that Mr. Bonafe's renewed application is DENIED. After reviewing the audio recordings and considering all of defense counsel's arguments, the Court continues to find that no condition or combination of conditions of release will reasonably assure the safety of the community, and that Mr. Bonafe has not rebutted the presumption of detention. Even if one of the assaults for which Mr. Bonafe was present (and likely participated in) did not involve a knife, a fact that is far from clear in the audio excerpts, the record continues to show that Mr. Bonafe is a high-ranking and influential member of a violent organization, who has himself participated in robberies and other acts of violence. *See, e.g.*, Hearing Tr. at 25–29. The Court further finds that the impact of COVID-19 on Mr. Bonafe's ability to review discovery materials in the law library does not compel his release; he is directed to raise his right to review discovery in his case to the legal staff at his facility, and his counsel may file a letter motion with the Court if the issue remains unresolved. Defendant's remaining arguments were advanced and considered at the prior hearing and require no further exposition.

**SO ORDERED.**

**Dated: March 26, 2020**
**New York, NY**

**VALERIE CAPRONI**
**United States District Judge**

Ex. 1

# raiser&kenniff
## ATTORNEYS AT LAW

**Steven M. Raiser**
Thomas A Kenniff
Ethan D. Irwin
Anthony V. Falcone
Nipun Mawaha

300 Old Country Road, Suite 351
Mineola, New York 11501
Tel. 516-742-7600 • Fax 516-742-7618

Of Counsel
Edward Fregosi
John J. Rivas
Amy Sklar
**Patricia A. Craig**
Anthony J. Colleluori
E. Gordon Haesloop
Bruce R. Connolly

March 24, 2020

**VIA ECF**

Hon. Valerie E. Caproni
United States Courthouse
Southern District of New York
40 Foley Square, Room 240
New York, NY 10007

Re: United States of America v. Emmanuel Bonafe Indictment
No.: 19-00862-6 (VEC)

Second Letter Motion to Reconsider Detention Order, in Light of New Evidence and COVID-19 Pandemic

Dear Judge Caproni:

I am the attorney for Emmanuel Bonafe, a defendant under Indictment 19-00862-VEC-6. Mr. Bonafe was arraigned, in front of Magistrate, Hon. Barbara C. Moses, on December 5, 2019 by Richard Rosenberg, CJA counsel. At which time a detention hearing was conducted and Mr. Bonafe was remanded. On January 30, 2020, I appeared before your Honor to request that Mr. Bonafe's bail be reconsidered. Our request was denied. I write to request that your decision of January 30, 2022, be reconsidered in light of information that we have received during our review of the discovery provided to us by the Government.

During Mr. Bonafe's arraignment, the Court stated that he was being remanded, because of his being an alleged danger to the community. One of the key "acts of violence" relied upon by the Government and cited by the Magistrate at the initial retention hearing was regarding an alleged slashing involving an individual identified as Smiley (December 5, 2019 transcript at P30, Lines 16-19). Furthermore, at the bail reconsideration hearing held on January 30, 2020, the Court relied on the same rationale and the same information to deny Mr. Bonafe's bail. We are now asking your Honor to review this remand status again due to the fact that the information this Court relied on was incorrect in regards to this "slashing" was incorrect, or at very best, grossly overstated.

Telephone recordings clearly demonstrate that there was likely no slashing at all and if there was it did not involve Mr. Bonafe.

USAO_000055 (3:35-4:08) - call with Carmelo Velez – he, as a witness to the attack, indicates that it was Smiley who threw the first punch and it was Smiley who attempted to cut Bonafe (cutting his shirt).

USAO_000056 (3:05-3:20) – call with Smiley – Smiley states that he didn't know if the wound on his face was a slice or a punch. The wound was "very thin and then opened up."

Copies of these calls are attached for your review.

In light of this additional information and the ongoing Covid-19 pandemic, leaving all incarcerated inmates at risk to contract the potentially deadly disease while living in closed quarters, we ask the Court to reconsider our bail application and release Mr. Bonafe on the bail package, pursuant to our request filed on January 23, 2020.

Sincerely,

/s/

Steven M. Raiser

CC:  AUSA Adam S. Hobson
AUSA Elinor L. Tarlow

Ex. 2



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York  10007*

March 25, 2020

**BY EMAIL**

The Honorable Valerie E. Caproni
United States District Court Judge
Southern District of New York
40 Foley Square
New York, New York 10007

     **Re:**    *United States v. Emmanuel Bonafe, a/k/a "Eazy,"* **19 Cr. 862 (VEC)**

Dear Judge Caproni:

       We write in response to the defendant's March 24, 2020 motion for this Court to reconsider its order that the defendant be detained.  This is the third time the defendant has moved for bail.  The purported new evidence raised by the defendant is not, in fact, new.  It is not only consistent with the representations previously made to the Court, but it is also incomplete.  We respectfully request that the Court deny the defendant's renewed motion for release on bail.

### The Smiley Slashing

       In the Court's January 30, 2020 bail hearing, the Government proffered evidence of multiple acts of violence the defendant was personally involved in as a high-ranking leader of the Black Mob.  One of these was the slashing of a rival gang member named "Smiley" that occurred on June 10, 2017.  The defendant contends that recorded telephone calls produced in discovery "clearly demonstrate that there was likely no slashing at all and if there was it did not involve Mr. Bonafe."  Mot. at 2.  This is false.

       New York City Police Department ("NYPD") reports confirm that on the afternoon of June 10, 2017, the NYPD did in fact respond to 911 calls about an attack in Thomas Jefferson Park in Manhattan.  When the police arrived, they found the victim, an individual who is known by law enforcement to go by the name "Smiley," with a laceration on the left side of his face, bleeding and in pain.  On June 19, 2017, a cooperating witness ("CW-1") placed a recorded call to co-defendant Carmelo Velez, a/k/a "Jugg," the First Crown of the Black Mob.  The defendant's motion selectively quotes only a portion of that call to suggest that Velez did not implicate the defendant.  Contrary to the defendant's characterization, Velez clearly tells the cooperating witness that the defendant—known in the Black Mob by the alias "Eazy"—was involved in the attack.

When Velez described the attack to the CW-1, Velez clearly placed the defendant at the scene and involved, saying, "So, so now I walk, I'm with—Eazy's right next to me, so I'm like, 'Yo Smiley, leave that shit for another day bro. You know what I'm saying? We're here to show love. We're not trying to start no static right now. Alright bro.' I walk past, Eazy goes up to him like, 'Yo my n****, what's poppin'?' Cause Eazy heard he was talking shit. So he's like, 'Yo, um, you was talkin' spicy about me when you was locked up?' He was like, 'Yeah,' so Eazy's like, 'Alright, but why you never pop before?'"

Velez then continued to describe the attack itself, saying, "Cause what happened was we popped it off. Boom, boom, boom, boom—the whole mob jumping the n****. There was like fifteen of us. We cleaned this n**** out. N**** start rippin' em. Boom, boom, boom, boom, boom, but this is . . . alright we jumped him first. He tried to run. Somebody caught him from behind and suplexed [PH] him off the top rope, boom! Hit the floor, n****s ripped 'em, bing, bing, boom, boom, and we started kickin' on top of the [UI]. Boom, boom, boom, boom, stomped him out. The widows was the one that came and was like, 'Stop! You're about to kill him.' We left that n**** bleedin', the eyes rolled back, swollen so his face could not see no more. Rips all over his fuckin' shit, convulging . . . . We finished the first time, cause we jumped him like three times, we finished the first time, his eyes were already pitch black bro. Ya understand what I'm tryin' to say? His eye was pitch black.'"

Approximately two years later—on May 7, 2019—the defendant himself admitted his involvement in an attack on Smiley to a different cooperating witness ("CW-2"). CW-2 was wearing a recording device at the time. In that conversation, the defendant talked about a prior incident in which "that n**** Smiley was there with a big bandage on his face cause the shit, he just got, I just fired on the n**** the day before." And on December 18, 2018, the defendant sent a Facebook message about someone who had wronged him that read, "Imma do him like Smiley."

This evidence shows that, contrary to the defendant's motion, there *was* a violent slashing of a rival gang member named Smiley, and the defendant *was* involved in that slashing.

## Other Indications of Dangerousness

Of course the Smiley slashing was just one of the factors the Court considered when finding that there were no conditions of release that could reasonably ensure the safety of the community. The Government refers the Court to the transcript of the prior hearing for a more fulsome description, but this included the fact that the defendant served in high-ranking positions in the Black Mob, including the powerful position of Third Crown, also known as the "Warlord." It also included a number of acts of violence that the defendant committed in addition to the Smiley slashing, including multiple violent robberies and assaults; the fact that the defendant carried guns and told other Black Mob members that he had a machine gun to sell; and the fact that the defendant sold large amounts of oxycodone.

The defendant's criminal history also indicated that the defendant would be a danger to the community if released. He has repeatedly broken the law—even while on probation—and his lawful employment and family have not deterred him from selling drugs and committing violence. His history of defying court supervision and committing crimes even while on probation showed

that there were no conditions of pretrial release that could reasonably assure the safety of the community.

## **COVID-19**

In the conclusion of his motion, the defendant briefly raises the issue of the COVID-19 outbreak. Though the defendant devotes no more than a single sentence to the issue, the Government is of course very aware of the impact this virus is having on our community in general and the prisons in particular. The defendant does not appear to have any factors that make him high-risk, including age or pre-existing health conditions. Moreover, we understand that the virus has made pretrial supervision on bail more difficult, as Pretrial Services is experiencing a shortage of electronic monitoring equipment, and in-person visits create a risk of exposure. If anything, the current circumstances increase, rather than decrease, the risks that would be created by the defendant's release.

For these reasons and others, the Government requests that the defendant continue to be detained.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By _____
AUSA Adam S. Hobson
AUSA Elinor Tarlow
212-637-2484

cc:     Steven M. Raiser, Esq. (by email)

# RAISER AND KENNIFF, PC

300 Old Country Rd., Suite 351, Mineola, NY 11501

Hon. Valerie E. Caproni
United States Courthouse
Southern District of New York
40 Foley Square, Room 240
New York, NY 10007

 Re: *United States v. Emmanuel Bonafe, a/k/a "Eazy,"* **19 Cr. 862 (VEC) Reply**

Dear Judge Caproni:

The Government in their answer to our letter motion states,

> New York City Police Department ("NYPD") reports confirm that on the afternoon of June 10, 2017, the NYPD did in fact respond to 911 calls **about an attack** in Thomas Jefferson Park in Manhattan. When the police arrived, they found the victim, an individual who is known by law enforcement to go by the name "Smiley," with **a laceration** on the left side of his face, bleeding and in pain

There is no question that there was an attack. However, the above statement fails to demonstrate that the attack involved anyone cutting Smiley with a knife. There is nothing to demonstrate that the laceration was caused by a knife. As we indicated in our initial letter motion, Smiley himself was unclear how the altercation occurred and instead focused on the cut being thin. In fact, he indicates it was likely the result of being struck and that wound opened up from continued blows. In this case, there is no witness to say a knife was ever seen being wielded against Smiley and not a single witness that said that the wound itself was necessarily indicative of a knife wound.

Based upon the above, it is now clear that there is zero proof of a slashing being committed by Mr. Bonafe. The Government has offered no evidence to refute this. Instead, the Government goes on to talk generally about an attack. The Government states,

> Velez clearly tells the cooperating witness that the defendant—known in the Black Mob by the alias "Eazy"—was *involved* in the attack.

By making this statement they are in essence conceding the lack of evidence regarding a slashing with a knife (not merely an physical confrontation), which they argued was evidence of his alleged dangerousness.

The Government then attempts to put significance on the fact that Mr. Bonafe was *present* during the fight with Smiley. This is a far cry from proof of slashing someone with a knife. In this regard the Government states,

> When Velez described the attack to the CW-1, Velez clearly placed the defendant at the scene and involved, saying, "So, so now I walk, I'm with—Eazy's right next to me, so I'm like, 'Yo Smiley, leave that shit for another day bro. You know what I'm saying? We're here to show love. We're not trying to start no static right now. Alright bro.' I walk past, Eazy goes up to him like, 'Yo my n****, what's poppin'?' Cause Eazy heard he was talking shit. So he's like, 'Yo, um, you was talkin' spicy about me when you was locked up?' He was like, 'Yeah,' so Eazy's like, 'Alright, but why you never pop before?'"

There is nothing in that exchange to indicate anything other than mere presence at the scene of what turned into a fight. It does not speak to anything about Mr. Bonafe being involved in any way in a slashing. The Government goes on to quote, from that same call, stating virtually nothing about *Mr. Bonafe's involvement* either directly or indirectly in the beating of Smiley and again absolutely nothing regarding a slashing.

> Velez then continued to describe the attack itself, saying, "Cause what happened was we popped it off. Boom, boom, boom, boom—the whole mob jumping the n****. There was like fifteen of us. We cleaned this n**** out. N**** start rippin' em. Boom, boom, boom, boom, boom, but this is . . . alright we jumped him first. He tried to run. Somebody caught him from behind and suplexed [PH] him off the top rope, boom! Hit the floor, n****s ripped 'em, bing, bing, boom, boom, and we started kickin' on top of the [UI]. Boom, boom, boom, boom, stomped him out. The widows was the one that came and was like, 'Stop! You're about to kill him.' We left that n**** bleedin', the eyes rolled back, swollen so his face could not see no more. Rips all over his fuckin' shit, convulging . . . . We finished the first time, cause we jumped him like three times, we finished the first time, his eyes were already pitch black bro. Ya understand what I'm tryin' to say? His eye was pitch black.'

The Government then alleges that Mr. Bonafe, the day after the attack says, "I just fired on the n**** the day before." The Government wants to assume this means that Mr. bonafe struck Smiley at some point, but If you line this up with what the witness said in the previous conversation, it is more likely regarding what was *said* between the two and not a physical altercation. Again, nothing about Mr. Bonafe's use of a knife in any regard against Smiley.

> 'Yo, um, you was talkin' spicy about me when you was locked up?' He was like, 'Yeah,' so Eazy's (Mr. Bonafe) like, 'Alright, but why you never pop before?'"

Finally the Government indicates,

> And on December 18, 2018, the defendant sent a Facebook message about someone who had wronged him that read, "Imma do him like Smiley."

This too admits nothing regarding a slashing or use of a knife. The Government has been given every opportunity to cite the evidence to support the allegation that Mr. Bonafe slashed Smiley, or that a slashing even occurred. This is a contention they used, without evidence to support it, to imprison Mr. Bonafe before a trial. In addition, to say "Imma do him like Smiley" also falls short of the promises made during the bail hearing. He is not quoted as saying, Imma gonna do him like **I did** Smiley.  It is instead a threat of what he might do to Smiley in the future, that he will do to Smiley what was done to Smiley before, not that he was involved in what happened to him previously. Again, however you want to categorize it, there is nothing about a knife or a slashing in that statement either.

The Government then offers some additional allegations of dangerousness.

> the defendant served in high-ranking positions in the Black Mob, including the powerful position of Third Crown, also known as the "Warlord."

> multiple violent robberies and assaults; the fact that the defendant carried guns and told other Black Mob members that he had a machine gun to sell; and the fact that the defendant sold large amounts of oxycodone.

These accusations are based *solely* on a cooperating witness assertions. Mr. Bonafe was trailed and surveilled for years. There is no *evidence* to substantiate any of the assertions of the cooperating/interested witnesses. After years of surveillance and recorded conversations, including videos of meetings: there is not one controlled buy involving guns or drugs. There are no conversations admitting to drug or gun sales (only conversations stating what Mr. Bonafe *could* provide, nothing about him actually providing anything illicit) nothing about this alleged rank, no admissions. There are no videos showing Mr. Bonafe carrying a firearm, much less selling one. There was some speculation that a video did exist showing a sale of a machine gun this is in fact not the case (as such, was not mentioned in the Government's answer to my letter motion).

All of the above should give this Court pause and should lead to an acknowledgment that the proof regarding his alleged dangerousness is based on very weak and sometimes non-existent evidence. The Government wants to then have the Court rely on his criminal history which is, I would argue, not significant.

The only charge involving a firearm occurred 10 years ago when my client was a teenager. The assault the Government cited was a bar fight that happened nearly 10 years ago. Nor does the fact that it happened at the tail end of probationary period indicate a danger to society so serious that no bail conditions could render society safe from him. We ask this Court to keep in mind, there has been 8 years that have passed with *no* supervision and there are no new arrests for assaults or the like.

Finally, the Government speaks to COVID-19. When I wrote my initial motion, I did not believe anything more than the mention of this crisis would be needed to alert this Court to at least a serious consideration in releasing Mr. Bonafe. This is especially true in a case like this, where a

key piece of evidence the Government set forth was exposed as insufficient to support their contentions for keeping him in remand status.

As to the very real crisis regarding COVID-19, every inmate is a risk to literally the entire prison population, including personnel. If one gets it, the potential to spread quickly is immense. This virus is dangerous for all those infected, not just those in a high-risk category. It also creates a large obstacle to Mr. Bonafe's ability to assist in his own defense. No one from my office can visit him. As the Government noted, in person visits create a risk of exposure and I have a young child at home and an elderly mother who is very involved in child care for my daughter. I cannot expose either of them to the conditions at the facility since there is a great likelihood that someone in that facility will contract the virus and potentially give it to me.

In addition, my client is no longer permitted library hours, which was the only time he could review the voluminous discovery in this case. Now he has nothing, no access at all. Furthermore, if the ankle bracelet is a prerequisite to his release then pre-trial services should make every effort to get one. We should not give up on the possibility that they could do just that. In any event, this Court should consider that the bail package proposed by my office would be enough to ensure his return to court and the safety of the community. The danger right now is in confinement. Once he is out, he can isolate himself at his home for 2 weeks, along with his finance, as her parents care for their child.

Sincerely,

/s/

Steven M. Raiser

CC:  AUSA Adam S. Hobson
AUSA Elinor L. Tarlow